J-S30023-17 & S30024-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2097 MDA 2016 |

Appeal from the Decree November 23, 2016
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000233-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: D.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2105 MDA 2016 |

Appeal from the Decree November 23, 2016
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000232-2014

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2106 MDA 2016 |

Appeal from the Decree November 23, 2016
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0015

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.D.W., NATURAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2109 MDA 2016 |

Appeal from the Decree November 23, 2016
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0016

| | | |
|---|---|---|
| IN THE INTEREST OF: D.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2098 MDA 2016 |

Appeal from the Order November 23, 2016
In the Court of Common Pleas of York County
Juvenile Division at No(s):  CP-67-DP-0000232-2014

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  D.J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  T.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2108 MDA 2016 |

Appeal from the Decree November 23, 2016
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2016-0015

BEFORE:   SHOGAN, RANSOM, and MUSMANNO, JJ.

MEMORANDUM BY RANSOM, J.:                          **FILED JUNE 29, 2017**

A.D.W. ("Mother") and T.M. appeal from the decrees and order entered on November 23, 2016, granting the petitions filed by the York County Children and Youth Services Agency ("CYS" or the "Agency"), to involuntarily terminate their parental rights to D.J.W. (a male, born in January of 2012) pursuant to the Adoption Act, 23 Pa.C.S. §2511(a)(1), (2), (5), (8), and (b),

- 3 -

and change the permanency goal for D.J.W. to adoption under the Juvenile Act, 42 Pa.C.S. § 6351. Mother also appeals from the decrees and orders granting the petitions to involuntarily terminate her parental rights to a second child, D.M.W. (a male, born in June of 2003), pursuant to section 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, and change D.M.W.'s permanency goal to adoption under section 6351 of the Juvenile Act.[1] We affirm.[2]

The trial court set forth the factual background and procedural history regarding the appeals relating to D.J.W. as follows:

1. D.J.W. was born on January 11, 2012.

2. The natural mother of [D.J.W.] is [A.D.W.], whose current address is [   ] York, Pennsylvania 17403.

3. The [f]ather of [D.J.W.] is [T.M.], who was released from York County Prison on May 17, 2016 on supervised bail.

4. [T.M.'s] criminal charges of indecent assault and corruption of minors were nolle prossed on July 21, 2016.

_____

[1] On that same date, the trial court also entered an order involuntarily terminating the parental rights of D.M.W.'s father, C.T.-M. C.T.-M. has not filed an appeal from the termination of his parental rights or the change of D.M.W.'s permanency goal to adoption, nor is he a party to the present appeals. In fact, CYS has never been able to locate C.T.-M., and his whereabouts have been unknown despite diligent searches by CYS. *See* Trial Court Adjudication re: D.M.W., 11/23/16, at 2, 8-10, 18.

[2] This Court consolidated Mother's appeals and consolidated T.M.'s appeals. We then listed Mother's and T.M.'s appeals consecutively. We will address Mother's appeals regarding both D.J.W. and D.M.W. (collectively, the "Children"), together with T.M.'s appeals regarding D.J.W., because of overlapping of issues, for ease of disposition.

5. On August 25, 2016, [T.M.] pled guilty to disorderly conduct.

6. [T.M.'s] current address is [    ] Littlestown, Pennsylvania 17340.

7. A Certification of Acknowledgement of Paternity for D.J.W. was filed on March 3, 2016, and indicates that there is not a claim or Acknowledgement of Paternity on file for [D.J.W.].

8. A Petition for Involuntary Termination of Parental Rights and a Petition to Change Court Ordered Goal were filed on February 24, 2016 by the Agency.

9. An Application for Emergency Protective Custody was filed by the Agency on November 19, 2014 [regarding charges that T.M. had abused the Children's half-sibling, S.S., who was a five-year old female].  [N.T., 9/21/16, at 45.]

10. In an Order for Emergency Protective Custody dated November 19, 2014, sufficient evidence was presented that continuation or return of [D.J.W.] to Mother and [T.M.] was not in the best interest of [D.J.W.].

11. In a Shelter Care Order dated November 24, 2014, sufficient evidence was presented to prove that continuation or return of [D.J.W.] to the home of Mother and [T.M.] was not in the best interest of [D.J.W.].  Legal and physical custody of [D.J.W.] was awarded to the Agency.  [D.J.W.] was to be placed in foster care.

12. A Dependency Petition was filed by the Agency on November 25, 2014.

13. On April 15, 2015, [D.J.W.] was adjudicated dependent. Legal and physical custody was awarded to the Agency. [D.J.W.] was placed in foster care.  The goal initially established was return to a parent or guardian.

14. [D.J.W.] has remained dependent since April 15, 2015.

15. Family Service Plans were prepared and dated as follows:

    a. Initial Family Service Plan dated December 18, 2014.

b. Revised Family Service Plan dated April 16, 2015.

c. Revised Family Service Plan dated May 8, 2015.

d. Revised Family Service Plan dated October 27, 2015.

e. Revised Family Service Plan dated April 12, 2016.

16. In a Permanency Review Order dated May 8, 2015, the [c]ourt made certain findings and conclusions, including, but not limited to:

a. There had been moderate compliance with the Permanency Plan by the [m]other and minimal compliance with the Permanency Plan by [T.M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [T.M.] had made minimal progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.J.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.J.W.] outside the care and custody of the [m]other and [T.M.].

17. In a Permanency Review Order dated October 27, 2015, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been minimal compliance with the Permanency Plan by Mother and full compliance with the Permanency Plan by [T.M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [T.M.] had made minimal progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.J.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.J.W] outside the care of the [m]other and [T.M.].

18. In a Permanency Review Order dated April 12, 2016, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been moderate compliance with the Permanency Plan by Mother and no compliance with the Permanency Plan by [T.M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [T.M.] had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.J.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.J.W.] outside the care of the [m]other and [T.M.].

19. In a Permanency Review Order dated September 21, 2016, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been no compliance with the Permanency Plan by Mother and minimal compliance with the Permanency Plan by [T.M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made no progress towards alleviating the circumstances which necessitated the original placement and [T.M.] had made minimal progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.J.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.J.W.] outside the care of the [m]other and [T.M.].

20. [D.J.W.] has no special needs.

21. A pre-adoptive resource has been identified for [D.J.W.].

Trial Court Adjudication re: D.J.W., 10/23/16, at 2-7.

Regarding D.J.W., the trial court further explained:

An evidentiary hearing was held on May 3, 2016, May 24, 2016, July 7, 2016, July 8, 2016, and September 1, 2016 addressing testimony and evidence relating to [Mother] and an evidentiary hearing was held on September 21, 2016 and October 26, 2016 addressing testimony and evidence relating to [T.M.]. The entire Dependency Record for minor child, D.J.W., docketed at CP-67-DP-232-2014, was incorporated into the hearing record. Additionally, the Stipulation of Counsel filed May 2, 2016 and joined by Attorney Miller, Attorney McNaney and Attorney Semke was also incorporated into the hearing record for [D.J.W.], along with Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11 for the Agency. CASA Exhibit #1 was incorporated into the record. [T.M.'s] Exhibits #1 and 2 were entered into the record at the hearing on May 3, 2016 and [T.M.'s] Exhibit #3 was entered into the record at the hearing on October 26, 2016. Based upon the testimony and evidence presented at the hearing, as well as the history of this case, the Petition to Change Court Ordered Goal and the Petition for Involuntary Termination of Mother's and [T.M.'s] Parental Rights [were] GRANTED as to D.J.W.

*Id.* at 1-2.

- 8 -

The trial court set forth the factual background and procedural history regarding the appeals relating to D.M.W. as follows:

1. D.M.W. was born [in June of 2003].

2. The natural mother of the minor child is [Mother], whose current address is [    ] York, Pennsylvania 17403.

3. The [f]ather of [D.M.W.] is [C.T.-M.], whose whereabouts are unknown.   [C.T.-M's] whereabouts have been unknown for the entirety of the underlying Dependency matter.

4. A Certification of Acknowledgement of Paternity for D.M.W. was filed on March 3, 2016, and indicates that there is not a claim or Acknowledgement of Paternity on file for [D.M.W.].

5. A Petition for Involuntary Termination of Parental Rights and a Petition to Change Court Ordered Goal were filed on February 24, 2016 by the Agency.

6. An Application for Emergency Protective Custody was filed by the Agency on November 19, 2014.

7. In an Order for Emergency Protective Custody dated November 19, 2014, sufficient evidence was presented that continuation or return of [D.M.W.] to Mother . . . was not in the best interest of [D.M.W.].

8. In a Shelter Care Order dated November 24, 2014, sufficient evidence was presented to prove that continuation or return of the minor child to the home of Mother . . . was not in the best interest of the minor child.   Legal and physical custody of [D.M.W.] was awarded to the Agency.   [D.M.W.] was to be placed in foster care.

9. A Dependency Petition was filed by the Agency on November 25, 2014 [regarding charges that T.M. had abused the Children's half-sibling, S.S., who was a five-year old female].   [N.T., 9/21/16, at 45.].

10. On April 15, 2015, [D.M.W.] was adjudicated dependent. Legal and physical custody was awarded to the Agency.

[D.M.W.] was placed in shelter care. The goal initially established was return to a parent or guardian.

11. [D.M.W.] has remained dependent since April 15, 2015.

12. Family Service Plans were prepared and dated as follows:

a. Initial Family Service Plan dated December 18, 2014.

b. Revised Family Service Plan dated April 16, 2015.

c. Revised Family Service Plan dated May 8, 2015.

d. Revised Family Service Plan dated October 27, 2015.

e. Revised Family Service Plan dated April 12, 2016.

13. In a Permanency Review Order dated May 8, 2015, the [c]ourt made certain findings and conclusions, including, but not limited to:

a. There had been moderate compliance with the Permanency Plan by the [m]other and no compliance with the Permanency Plan by [C.T.-M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [C.T.-M.] had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.M.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.M.W.] outside the care and custody of the Mother and [C.T.-M.].

14. In a Permanency Review Order dated October 27, 2015, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been minimal compliance with the Permanency Plan by Mother and no compliance with the Permanency Plan by [C.T.-M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [C.T.-M.] had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of the minor child was confirmed with the Agency.

e. There continued to be a need for placement of the minor child outside the care of the [m]other . . . .

15. In a Permanency Review Order dated April 12, 2016, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been moderate compliance with the Permanency Plan by Mother and no compliance with the Permanency Plan by [C.T.-M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [C.T.-M.] had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.M.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.M.W.] outside the care of the Mother and [C.T.-M.].

16. In a Permanency Review Order dated September 1, 2016, the [c]ourt made certain findings and conclusions including, but not limited to:

a. There had been moderate compliance with the Permanency Plan by Mother and no compliance with the Permanency Plan by [C.T.-M.].

b. Reasonable efforts had been made by the Agency to finalize the Permanency Plan.

c. Mother had made moderate progress towards alleviating the circumstances which necessitated the original placement and [C.T.-M.] had made no progress towards alleviating the circumstances which necessitated the original placement.

d. Legal and physical custody of [D.M.W.] was confirmed with the Agency.

e. There continued to be a need for placement of [D.M.W.] outside the care of the Mother and [C.T.-M.].

17. [D.M.W.] currently has an I.E.P. [Individual Education Plan].

18. [D.M.W.] is enrolled in an emotional support classroom.

19. [D.M.W.] participates in mobile therapy through PCBH for four (4) hours per week.

20. A pre-adoptive resource has been identified for [D.M.W.].

Trial Court Adjudication re: D.M.W., 11/23/16, at 2-7.

Regarding D.M.W., the trial court further explained:

An evidentiary hearing was held on May 3, 2016, May 24, 2016, July 7, 2016, July 8, 2016, and September 1, 2016 addressing testimony and evidence relating to [Mother] and [C.T.-M.]. The entire Dependency Record for minor child, D.M.W., docketed at CP-67-DP-233-2014, was incorporated into the hearing record. Additionally, the Stipulation of Counsel filed May 2, 2016 was also incorporated into the hearing record for [D.M.W.], along with Exhibits 1, 2, 3, 4, 5, 6, 7, 8, 9, 10 and 11 for the Agency.

CASA Exhibit #1 was incorporated into the record. Based upon the testimony and evidence presented at the hearing, as well as the history of this case, the Petition to Change Court Ordered Goal and the Petition for Involuntary Termination of Mother's and [C.T.-M.'s] Parental Rights [were] GRANTED as to D.M.W.

Trial Court Adjudication re: D.M.W., 11/23/16, at 1-2.

In separate decrees and orders entered on November 23, 2016, the trial court found clear and convincing evidence to terminate the parental rights of Mother and T.M. to D.J.W., and change D.J.W.'s permanency goal to adoption, and to terminate the parental rights of Mother and C.T.-.M. to D.M.W., and change D.M.W.'s permanency goal to adoption.

On December 21, 2016, Mother filed notices of appeal with concise statements of errors complained of on appeal pursuant to Pa.R.A.P 1925(a)(2)(i) and (b) with regard to the termination decrees and goal change orders relating to the Children. On December 23, 2016, T.M. filed notices of appeal with concise statements of errors complained of on appeal with regard to the termination decree and goal change order relating to D.J.W.

In her brief on appeal, Mother raises the following issues:

1. Did the Court err in terminating the parental rights of Mother when Mother successfully alleviated the circumstances which gave rise to the initial dependency finding prior to filing for termination?

2. Did the Court err in terminating the parental rights of Mother by failing to determine that Mother was ready, willing and able to care for the dependent children?

3. Did the Court err in terminating the parenting rights of Mother when the Agency failed to provide proper services to alleviate the circumstances claimed for continued dependency?

4. Did the Court err in terminating the parental rights of Mother when many of the alleged circumstances for Mother's inability to care for the child [sic] were financially driven, and the return of the children would have cured the circumstances?

Mother's Brief, at 4.[3]

In his brief on appeal, T.M. raises the following issues:

I. Whether the court abused its discretion in terminating [T.M.'s] parental rights under 23 Pa.C.S. 2411(a)(1)[,] (2)[,] (5)[,] and (8) in that [T.M.] was incarcerated and was unable to perform parental duties given his incarceration and the trial court's no contact order[?]

I[sic]. Whether the trial court erred by changing the court ordered goal from reunification to adoption[?]

T.M.'s Brief, at 4.[4]

_____

[3] Mother does not raise the change of the permanency goal for the Children to adoption in any of her concise statements or the statement of questions involved portion of her brief. Thus, she has waived any challenge to the goal change. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his concise statement of errors complained of on appeal and the statement of questions involved in his brief on appeal). In her concise statement at Docket Nos. 2105 MDA 2016 and 2106 (regarding D.J.W.), Mother failed to include her third issue regarding CYS's failure to provide services. We, nevertheless, have reviewed the issue, as Mother raised it in her appeals at Docket Nos. 2097 and 2109 MDA 2016 (regarding D.M.W.). In light of Mother's filing of her appeals from all of the decrees and orders regarding the Children at the same time, the omission of the issue in the one concise statement appears to have been a clerical error.

[4] We note that T.M.'s first issue in his concise statement challenged the sufficiency of the evidence to support the termination of his parental rights
*(Footnote Continued Next Page)*

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an

*(Footnote Continued)* ───────────────

under section 2511(a), and did not specifically raise any subsection. We, nevertheless, find the issue preserved for this Court's review. *Cf. Krebs*, *supra*.

- 15 -

error of law or an abuse of discretion. ***In re Adoption of Atencio***, 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained:

> [t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue."

***Id.*** (*quoting* ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

Mother and T.M. argue that the trial court erred in terminating their parental rights under sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act. This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). We will focus on section 2511(a)(1) and (b), which provide as follows:

> **§ 2511. Grounds for involuntary termination**
>
> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

- 16 -

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Mother contends that the facts and circumstances that led to the initial finding that the Children were dependent and the removal of the Children from her home have been alleviated.  Mother's Brief, at 8.  She asserts "[t]he abuse allegation has been removed as has been the alleged perpetrator."  **Id.**  Mother claims that she, thus, has a safe, stable home for the Children, and that she is ready, willing, and able to care for them.  **Id.** Mother states that the trial court failed to afford proper examination to her reasons for the shortcomings that the trial court perceived on her part.  **Id.**

T.M. argues that the trial court erred and abused its discretion in finding that CYS presented sufficient evidence to support the termination of his parental rights and to change the permanency goal for D.J.W. to adoption.  **See** T.M.'s Brief, at 7.  T.M. asserts that he has used all available resources to preserve his parental relationship while he has been incarcerated.  **Id.**  T.M. complains that he had a lengthy incarceration, and was subject to a no contact order regarding D.J.W., which made it

- 17 -

impossible for him to perform parental duties or alleviate the conditions that led to the removal or placement. *Id.* He also states that he was ultimately not convicted on the charges that led to D.J.W.'s placement. *Id.* T.M. asserts that he is no longer incarcerated, and is willing to complete the court-ordered services. *Id.* With regard to the change in goal for D.J.W., T.M. contends that CYS made no efforts to finalize the permanency plan and the appropriateness and feasibility of the current placement goal for D.J.W. *Id.* T.M. claims that the combination of his incarceration and the trial court's no-contact order ensured that CYS would never have to work towards the established goal of reunification.

We have explained this Court's review of a challenge to the sufficiency of the evidence supporting the involuntary termination of a parent's rights pursuant to section 2511(a)(1) as follows:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.
>
> * * *
>
> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008) (citations omitted).

- 18 -

Further, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

*In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010) (citation omitted); *see*

*also In re Adoption of C.L.G.*, 956 A.2d 999, 1006 (Pa. Super 2008) (*en*

*banc*).

Moreover, regarding the definition of "parental duties," this Court has

stated as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed

in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

In *In re Adoption of S.P.*, our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (1975), and stated:

Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id.* at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id.*

*In re Adoption of S.P.*, 47 A.3d at 828. The Supreme Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[*McCray*] at 655 (footnotes and internal quotation marks omitted). . . .

*In re Adoption of S.P.*, *supra*.

Here, the trial court stated as follows with regard to the termination of the parental rights of Mother and T.M. to D.J.W. pursuant to section 2511(a)(1):

The Agency has proven by clear and convincing evidence that Mother and [T.M.] have failed to perform any significant parental duties for [D.J.W.]. [D.J.W.] has been dependent for approximately nineteen (19) months. [T.M.] was incarcerated from January 22, 2014 until May 17, 2016 and was prohibited from contact with [D.J.W.] due to his criminal charges. As such, [T.M.] performed no parental duties for [D.J.W.] during that time. Testimony established that, even prior to [T.M.'s] incarceration, [T.M.] was in and out of [D.J.W.'s] life and did not consistently provide parental duties for the minor child. The [c]ourt notes that [T.M.] did complete a parenting class while incarcerated. The [c]ourt acknowledges that [T.M.'s] incarceration prevented him from achieving the goals set forth for him in the various Family Service Plans. However, the [c]ourt weighs heavily the fact that, while [T.M.] was not able to directly contact [D.J.W.], [T.M.] failed to request any updates on the minor child's wellbeing. The [c]ourt is not surprised by [T.M.'s] lack of inquiry, as testimony established that prior to the minor child's placement and ultimate adjudication, [T.M.] was in and out of [D.J.W.'s] life for the child's first two (2) to two and a half (2½) years of life. Additionally, [T.M.] failed to inquire as to whether sending gifts or cards to the minor child through a third party would be acceptable given his limitation on contact with [D.J.W.]. As such, no gifts or cards were sent to [D.J.W.] by [T.M.].

Testimony established that Mother has not performed any significant parental duties for [D.J.W.] since the adjudication of dependency. Mother was consistent in attending visits with [D.J.W.]. However, testimony established that Mother interacts minimally with [D.J.W.] at the visits and that [D.J.W.] usually plays by himself. Additionally, Mother was told to be prepared to perform all parental duties for [D.J.W.] during the visits. However, testimony established that Mother regularly attends visits unprepared. For example, Mother neglects to bring drinks and snacks for [D.J.W.]. Furthermore, testimony established that Mother does not properly supervise [D.J.W.] during visits in the community. For example, Mother lost track of [D.J.W.] during a visit at a park. Despite these issues at visits, Mother has missed appointments with Pressley Ridge to review the effectiveness of the visits and to receive guidance on how to improve her parenting skills. The [c]ourt notes that Mother has never progressed to having unsupervised visits with [D.J.W.] and Pressley Ridge believes Mother's visits still need to be

supervised. Testimony further established that Mother does not initiate phone contact with [D.J.W.].

Mother currently has full-time employment and housing. However, Mother has had two (2) landlord/tenant complaints filed against her for failure to pay rent at her current residence. Additionally, testimony established that Mother no longer has a vehicle and relies on public transportation to attend visits with [D.J.W.]. Neither parent is in a position to obtain custody of [D.J.W.] at this time. [D.J.W.] is currently residing with a kinship family and testimony established that the child is comfortable in their home. Testimony established that [D.J.W.] looks to the kinship family for support and guidance.

Overall, the Court finds that the termination of Mother's and [T.M.'s] parental rights will provide a benefit to [D.J.W.] in that the child will achieve stability and permanency in a loving and safe home. Therefore, for all the reasons stated above, the Agency has proven by clear and convincing evidence that termination of parental rights to [D.J.W.] is justified pursuant to Section 2511(a)(1) of the Adoption Act.

Trial Court Adjudication, 11/23/16, at 12-15.

With regard to D.M.W., the trial court stated the following as to the

termination of Mother's parental rights under section 2511(a)(1):

The Agency has proven by clear and convincing evidence that Mother and [C.T.-M.] have failed to perform any significant parental duties for [D.M.W.]. [D.M.W] has been dependent for approximately nineteen (19) months. [C.T.-M.'s] whereabouts have been unknown since the adjudication of dependency and he has had no contact with the Agency or [D.M.W.]. Testimony established that Mother has not performed any significant parental duties for [D.M.W.] since the adjudication of dependency. Mother was consistent in attending visits with [D.M.W.]. However, testimony established that Mother interacts minimally with the [D.M.W.] at the visits. For example, a Pressley Ridge report dated June 28, 2016 indicated that Mother, [D.M.W.], and other siblings were all playing on their phones during the visit with no meaningful interactions with each other. It was further established that Mother usually talks with her adult son, [D.], during the visits and does not regularly interact

- 22 -

with the younger children, including [D.M.W.]. Additionally, Mother was told to be prepared to perform all parental duties for [D.M.W.] during the visits. However, the Pressley Ridge report indicates that Mother regularly attends visits unprepared. For example, Mother neglects to bring drinks and snacks for [D.M.W.]. Furthermore, testimony established that Mother does not properly supervise [D.M.W.] during visits in the community. For example, Mother lost track of [D.M.W.'s] younger sibling during a visit at a park. Despite these issues at visits, Mother has missed appointments with Pressley Ridge to review the effectiveness of the visits and to receive guidance on how to improve her parenting skills. The [c]ourt notes that Mother has never progressed to having unsupervised visits with [D.M.W.] and Pressley Ridge believes Mother's visits still need to be supervised. Testimony further established that Mother rarely initiates phone calls with [D.M.W.] and that she didn't even call [D.M.W.] on his birthday because she was too busy at work.

Mother currently has full-time employment and housing. However, Mother has had two (2) landlord/tenant complaints filed against her for failure to pay rent at her current residence. Additionally, testimony established that Mother no longer has a vehicle and relies on public transportation to attend visits with [D.M.W.]. Neither parent is in a position to obtain custody of the minor child at this time. [D.M.W.] is currently residing with a foster family and testimony established that [D.M.W.] is comfortable in their home. Testimony established that the minor child looks to the foster family for support and guidance.

Overall, the [c]ourt finds that the termination of Mother's and [C.T.-M.'s] parental rights will provide a benefit to [D.M.W.] in that [D.M.W.] will achieve stability and permanency in a loving and safe home. Therefore, for all the reasons stated above, the Agency has proven by clear and convincing evidence that termination of parental rights to [D.M.W.] is justified pursuant to Section 2511(a)(1) of the Adoption Act.

Trial Court Adjudication re: D.M.W., 11/23/16, at 11-14.

Mother's and T.M.s' arguments regarding section 2511(a)(1) essentially seek for this Court to make credibility and weight determinations different from those of the trial court. Mother's and T.M.'s arguments

- 23 -

concerning CYS's failure to provide reasonable efforts toward reunification between them and their children lack merit. ***See In re D.C.D.***, 105 A.3d 662 (2014), wherein our Supreme Court held that the trial court is not required to consider reasonable efforts in relation to a decision to terminate parental rights. ***Id.*** at 672-673, 675. After our careful review of the trial court's application of the law to the facts of this case, we find the trial court's determinations regarding section 2511(a)(1) with regard to D.J.W. and D.M.W. are supported by competent, clear and convincing evidence in the record with regard to both Mother and T.M. ***See In re Adoption of S.P.***, 47 A.3d at 826-27.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to review whether the requirements of subsection (b) are satisfied. ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***Id.*** at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the

determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, section 2511(b) does not require a formal bonding evaluation. *In re Z.P.,* 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa. Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in [and] of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and

emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d 753, 763-764 (Pa. Super. 2008) (affirming the involuntary termination of the mother's parental rights, despite the existence of some bond, where placement with the mother would be contrary to the child's best interests, and any bond with the mother would be fairly attenuated when the child was separated from her, almost constantly, for four years).

Our Supreme Court has observed that the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition, and that "[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent." *See In re: T.S.M.*, 71 A.3d at 267 (quoting *In re K.K.R.-S.*, 958 A.2d at 535). The Supreme Court instructed, "[t]he continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." *In re: T.S.M.*, 71 A.3d at 267 (quoting *In re Involuntary Termination of C.W.S.M.*, 839 A.2d 410, 418 (Pa. Super. 2003) (Tamilia, J. dissenting)).

We have explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. *In re Z.P.*,

994 A.2d at 1121. Further, this Court has stated: "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." *In re Adoption of C.L.G.*, 956 A.2d at 1007 (citing *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

With regard to the termination of the parental rights of Mother and T.M. to D.J.W. under section 2511(b), the trial court stated as follows:

> The [c]ourt has thoroughly evaluated [D.J.W.'s] relationships in this matter.
>
> The [c]ourt finds that [D.J.W.] had a limited bond with [T.M.] prior to [T.M.'s] incarceration. However, testimony established that, since incarceration, [T.M.'s] bond has significantly diminished with [D.J.W.]. Testimony established that [D.J.W.] has a significantly stronger bond with the kinship family. The [c]ourt finds that [D.J.W.] has a biological bond with Mother. It is the kinship family who provides for the minor child's daily needs and acts as [D.J.W.'s] parental figures. At this point, the [c]ourt believes that the termination of Mother's and [T.M.'s] parental rights will have no negative impact on [D.J.W.]. The kinship family has arranged for visits between [D.J.W.] and his siblings and is committed to maintaining that practice. As such, although [D.J.W.] is not living in the same home as his siblings, he will still be able to maintain contact and a relationship with his siblings.

The [c]ourt also finds that the bond between [D.J.W.] and kinship family is strong and healthy and that [D.J.W.] calls the kinship parents "mom" and "dad".

Testimony established that the child is happy and feels comfortable in the kinship family's care. The bond that the minor child has with the kinship family can provide safety, security and permanency for the child. Termination of parental rights will best meet the needs of [D.J.W.] and permit the child to achieve the stability that he deserves.

Trial Court Adjudication re: D.J.W., at 21-22.

Regarding the termination of Mother's parental rights to D.M.W. pursuant to section 2511(b), the trial court stated:

The [c]ourt has thoroughly evaluated [D.M.W.'s] relationships in this matter. The [c]ourt finds that [D.M.W.] has no relationship and no bond with [C.T.-M.]. The [c]ourt finds that [D.M.W.] has a biological bond with Mother. It is the foster family who provides for [D.M.W.'s] daily needs and acts as [D.M.W.'s] parental figures. [D.M.W.] testified that he does not wish to return to Mother's care and contends that Mother prioritizes her relationships with paramours over her relationships and care of her children. In fact, [D.M.W.] requested the [c]ourt to terminate his visits with Mother. At this point, the [c]ourt believes that the termination of Mother's and Father's parental rights will have no negative impact on [D.M.W.]. The foster family has arranged for visits between [D.M.W.] and his siblings and is committed to maintaining that practice. As such, although [D.M.W.] is not living in the same home as his siblings, he will still be able to maintain contact and a relationship with his siblings.

The [c]ourt also finds that the bond between [D.M.W.] and [his] foster family is strong and healthy and that the bond [D.M.W.] has with the foster family is significantly stronger than the strained bond [D.M.W.] has with Mother. Testimony established that the child is happy and feels comfortable in the foster family's care. The bond that [D.M.W.] has with the foster family can provide safety, security and permanency for the child. Termination of parental rights will best meet the needs of

[D.M.W.] and permit the child to achieve the stability that he deserves.

Trial Court Adjudication re: D.M.W., 11/23/16, at 17.

After our careful review of the record in this matter, we find that the trial court's credibility and weight determinations regarding the evidence in regard to the termination of the parental rights of Mother and T.M. to D.J.W., and the termination of Mother's parental rights to D.M.W., under section 2511(b) are supported by competent evidence in the record. *In re Adoption of S.P.*, 47 A.3d at 826-827.

Next, the Juvenile Act, 42 Pa.C.S.A. § 6301 *et seq.*, controls the question of change in permanency goal. The Pennsylvania Supreme Court recently set forth our standard of review in a dependency case as follows.

> "The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *In re R.J.T.*, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010). We review for abuse of discretion[.]

*In Interest of: L.Z.*, *A Minor Child*, 111 A.3d 1164, 1174 (2015).

When considering a petition for goal change for a dependent child, the trial court considers:

> the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S.A. § 6351(f)).

Regarding the disposition of a dependent child, section 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

Regarding the goal change to adoption for D.J.W., the trial court stated:

> In the present matter, the Agency has proven by clear and convincing evidence that it is in [D.J.W.'s] best interest to change the goal to placement for adoption. [D.J.W.] has been in placement for approximately twenty-four (24) months and adjudicated dependent for approximately nineteen (19) months. At this point, [D.J.W.] has been in placement approximately half of his life. [D.J.W.] needs a permanent, safe and stable environment. [D.J.W.] has been in placement since November 19, 2014. [T.M.] was incarcerated from January 22, 2015 until May 17, 2016 for charges of indecent assault and corruption of minors that were ultimately nolle prossed. During his incarceration, [T.M.] failed to make any inquiry as to [D.J.W.'s] wellbeing. Prior to [T.M.'s] incarceration, [T.M.] had four (4) supervised visits with [D.J.W.] in which he was not fully engaged with [D.J.W.] for the duration of the visits. Even prior to [D.J.W.'s] placement, testimony established that [D.J.W.] was in and out of the child's life. Since [T.M.'s] release from incarceration approximately six (6) months ago, [T.M.] has not exhibited a dedicated desire and commitment to work towards reunification with [D.J.W.]. For example, [D.J.W.] has failed to successfully complete an offending parent evaluation and class, obtain a threat of harm evaluation, or obtain a psychological evaluation as required by numerous previous Court Orders in order for [T.M.] to reunify with [D.J.W.].

Since the adjudication of dependency, Mother has been evicted from a residence due to her failure to pay rent and has had two (2) landlord/tenant complaints filed against her at her current residence due to non-payment of rent. Testimony established that Mother no longer has a vehicle and relies on public transportation to attend visits with [D.J.W.]. Testimony established that Mother has been consistent in attending visits with [D.J.W.]. However, testimony also established that Mother interacts minimally with [D.J.W.] at said visits and regularly comes unprepared to perform parental duties for [D.J.W.] during the visits. Testimony established that Mother does not properly supervise [D.J.W.] in community setting visits and the [c]ourt is concerned with her ability to appropriately parent a young child. As such, Mother has never progressed to unsupervised visits. Despite consistently attending visits with the minor child, testimony established that Mother has made no effort to maintain phone contact with [D.J.W.].

Mother has been assigned three (3) in-home teams. The first closed successfully but was regarding an older child of Mother's no longer at issue. The second team never opened with Mother because Mother failed to complete the intake process. The third team closed unsuccessfully with Mother due to Mother's failure to attend appointments. When [D.J.W.] was initially placed, Mother was allowing a coworker named [T.M.2 (not the T.M. who is D.J.W.'s father) to reside in her home. Stacy Washington with Pressley Ridge testified that she discovered that [T.M.2] was a Tier 3 Megan's Law Offender. When Stacy Washington approached Mother with the information, Mother ultimately minimized [T.M.2's] criminal record and the risk of harm to [D.J.W.] with [T.M.2] residing in her home. Since November 2014, Mother has resided with three (3) different men, two (2) of which had sex-related criminal charges. Since [D.J.W.] entered care in November 2014, it was a goal for Mother to complete the non-offending parent course with TRIAD. Mother began a program in January 2015 with a different provider but missed too many sessions and was discharged from the program. It took Mother approximately one and one half (1½) years to finally complete the program with TRIAD in February 2016, just as the Agency's Petition for Involuntary Termination of Parental Rights was being filed.

Overall, Mother and [T.M.] have made no progress towards alleviating the circumstances which caused [D.J.W.] to be placed and have not assumed any major parental duties for [D.J.W.]. As such, the [c]ourt finds that [D.J.W.'s] best interest demands that the goal be changed from reunification with a parent to placement for adoption.

\* \* \*

## CONCLUSIONS OF LAW

1. The current placement of D.J.W. continues to be necessary and appropriate. 42 Pa.C.S. §6351(f)(1).

2. Mother and [T.M.] have not been able to meet the goals set forth in the family service plans. 42 Pa.C.S. §6351(f)(2).

3. The circumstances which necessitated [D.J.W.'s] original placement have not been alleviated. 42 Pa.C.S. §6351(f)(3).

4. The current goal for the child of reunification with a parent is no longer feasible and appropriate because Mother and [D.J.W.] have failed to meet the irreducible minimum requirements necessary to parent the child. 42 Pa.C.S. §6351(f)(4).

5. The minor child's best interests demand that the current goal of reunification with a parent be changed to placement for adoption.

Trial Court Adjudication re: D.J.W., 11/23/16, at 9-11, 22.

After our careful review of the record in this matter, we find that the trial court's credibility and weight determinations are supported by competent evidence in the record. **_In re Adoption of S.P._**, 47 A.3d at 826-827. Thus, there is competent evidence in the record to support the trial court's decision to change D.J.W.'s permanency goal to adoption. **_See L.Z._**, 111 A.3d at 1174.

- 32 -

Had Mother not waived a challenge to the change of D.M.W.'s permanency goal to adoption, we would find that the trial court properly addressed the issue of goal change, as well, based on the analysis provided by the trial court, which is nearly identical for Mother to that provided in its Adjudication regarding the goal change for D.J.W.[5]

Accordingly, we affirm the trial court decrees involuntarily terminating the parental rights of Mother and T.M. to D.J.W., and Mother to D.M.W., and the orders changing the permanency goals for the Children to adoption.

Decrees and orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/29/2017

---

[5] We address the issue of the goal change for D.J.W. in our Memorandum as T.M. preserved the issue in his appeal. As part of ruling on his challenge, our consideration of Mother's ability to parent D.J.W. is necessary to determining the appropriateness of the trial court's disposition of the child. *In re A.K.*, 936 A.2d at 533; 42 Pa.C.S.A. § 6351(e), (f), (f.1), and (g).